**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DAVID WOODFORD, individually and
on behalf of a class of similarly situated
individuals,

                    *Plaintiff*,

v.

WORLD EMBLEM INTERNATIONAL,
INC., a Florida corporation,

                    *Defendant*.

Case No. 1:15-cv-02983-ELR-LTW

## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiff David Woodford ("Plaintiff" or "Woodford"), by and through his undersigned counsel, in accordance with Federal Rule of Civil Procedure 23, respectfully moves this Court for an order granting final approval to the class action Settlement Agreement[1] reached in this matter (*see* Dkt. 22-1, "Settlement Agreement").

The Settlement Agreement, which resolves claims challenging Defendant's practice of providing allegedly inadequate background check disclosures under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, ("FCRA" or the "Act"), was reached only following extensive negotiations overseen by a well-respected

---

[1] Unless otherwise specified, capitalized terms have the same meanings as those set forth in the Definitions section of the Settlement Agreement. *See* Dkt. 22-1.

mediator. It provides substantial monetary and non-monetary relief to Class Members—as evidenced by its robust claims rate of 18.85%—and represents the best result for the Settlement Class under the circumstances. As such, the Court should grant final approval and approve the Settlement in its entirety.

In support, Plaintiff submits the incorporated memorandum of law, stating as follows:

<u>**MEMORANDUM OF LAW**</u>

## I.   INTRODUCTION

The instant class action settlement seeks to resolve claims challenging Defendant's practice of providing allegedly inadequate background check disclosures under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, ("FCRA" or the "Act"). That is, named Plaintiff Woodford brought claims on behalf of himself and all similarly-situated prospective and actual employees of World Emblem alleging that World Emblem failed to provide appropriate "stand alone" disclosures and adverse-action notices under the FCRA.

The Parties reached a class action Settlement with the help of a well-respected mediator in Denver, Colorado, and the Court granted preliminary approval to the Settlement on October 19, 2016 (Dkt. 21.) On November 18, 2016 notice was mailed directly to the Class.

The response has been undeniably favorable. To date, 92 Settlement Class

Members (18.85% of the Settlement Class) have filed claims—easily exceeding the typical take rate in a consumer class action. Indeed, 18.85% (92/488) is an undeniably high claims rate. *See Shames v. Hertz Corp., 2012 WL 5392159* at *14 (S.D. Cal. Nov. 5, 2012) (citing cases where approval was granted when the class response rate ranged from 2% to 9% and approving "favorable" rate of 4.9%); *see also Williams v. Wells Fargo Bank, N.A.,* No. 11–cv–21233–RNS (S.D. Fla.) (approving lender placed insurance settlement where the final claims rate was 14.4%); *Hamilton v. SunTrust Mortg. Inc*., No. 13-60749-CIV, 2014 WL 5419507, at *5 (S.D. Fla. Oct. 24, 2014) (approving settlement with 3.9% claims rate); *White v. Experian Info. Solutions, Inc*., 803 F.Supp.2d 1086, 1100 (C.D. Cal. 2011) (an "underwhelming [5%] response rate does not mean that the Settlement, on the whole, is not fair, reasonable and adequate"); *Moore v. Verizon Commc'n Inc.,* No. C 09–1823 SBA, 2013 WL 4610764, at *8 (N.D. Cal. Aug.28, 2013) (granting final approval of class action settlement with 3% claims rate); *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1044 (S.D. Cal. 2015) (describing 7.7% as "higher than average claims rate....").

As explained below, the Court should grant final approval because the Settlement is fair reasonable and adequate. All Class Members have received changes to World Emblem's FCRA disclosure policies and practices that bring World Emblem into compliance with federal law. Furthermore, Class Members

that have filed claims are each set to receive $315 to $400—figures that readily beat the recoveries by class members in settlements resolving similar claims.

## II.    NATURE OF THE LITIGATION AND SETTLEMENT

A brief review of the factual and procedural background of the case follows.

### A.    The FCRA's Background Check Disclosure Rules.

The FCRA requires, before any consumer report (*i.e.*, background check) is obtained about a prospective employee, that the employer provide a disclosure and authorization informing the applicant or employee that such a report may be procured. Critically, the disclosure and authorization must be "clear and conspicuous" and be made "in a document that consists solely of the disclosure." 15 U.S.C. § 1681b(b)(2)(A)(i). The inclusion of extraneous information violates the FCRA. *See Reardon v. ClosetMaid*, 2013 WL 6231606 (W.D. Pa. Dec. 2, 2013) (finding that an FCRA disclosure and authorization violated the Act and did not stand alone due to a single-sentence waiver of liability); *Singleton v. Domino's Pizza, LLC*, 2012 WL 2455965 (D. Md. Jan. 25, 2012) (same); *see also Avila v. NOW Health Grp., Inc.*, No. 14 C 1551, 2014 WL 3537825, at *2 (N.D. Ill. July 17, 2014); *Johnson v. AT&T Corp.*, No. 4:14-CV-453 JAR, 2014 WL 3579886, at *2 (E.D. Mo. July 21, 2014); *Alame v. Norred & Associates, Inc.*, No. 2:13-CV-04280-NKL, 2014 WL 2574418, at *4 (W.D. Mo. June 9, 2014); *Boyd v. CEVA Freight, LLC*, No. 3:13-CV-00150-JAG, 2013 WL 6207418, at *4 (E.D. Va. Nov.

4

27, 2013); *Mattiaccio v. DHA Grp., Inc.*, 21 F. Supp. 3d 15, 17 (D.D.C. 2014);

*Johnson v. Casey's Gen. Stores, Inc.*, No. 6:15-CV-30860MDH, 2015 WL

4542143, at *3 (W.D. Mo. July 27, 2015).

Applied here, as explained below Plaintiff alleged that World Emblem's

disclosure and authorization, prior to the litigation, contained extraneous

information and violated the FCRA, which provides statutory damages of $100 to

$1,000 per violation. Because World Emblem used form disclosures, Plaintiff

brought this lawsuit as an alleged class action, and Plaintiff has worked with World

Emblem through the auspices of the Settlement to remove such information from

its disclosures going forward.

Likewise, under the FCRA, before adverse action (a decision not to hire, to

fire, etc.) may be taken, employers like World Emblem must send a notice, copy of

the background check, and summary of FCRA rights to the applicant/employee.

*See* FTC advisory letters, to Coffey, Lewis, and Hawkey[2] (explaining that

employers are to devise policies "that are appropriate, keeping in mind the clear

purpose of the provisions to allow consumers to discuss the report with employers

before adverse action is taken.") Plaintiff alleged that World Emblem skipped this

step of the process. Plaintiff further claims that Defendant directed applicants and

---

[2] *Available at* URL http://www.ftc.gov/policy/advisory-opinions/

employees only to Asurint, the company that supplies the background checks to World Emblem, and denied consumers the ability to explain any negative items before taking adverse action.[3] The settlement addresses this as well.

### B.    World Emblem's Background Check on Plaintiff

World Emblem employs over 700 people and describes itself as "one of the world's leading global suppliers of high quality apparel decorations." (Compl., Dkt. 1, ¶¶ 12, 13.) The Company is headquartered in Miami, Florida where it also operates a plant in addition to its plants in Atlanta, Georgia, Decatur, Illinois, Taylor, Michigan, Reno, Nevada, and Ontario, California. (*Id*. ¶ 14.)

In May 2015, Plaintiff Woodford applied for work at Defendant's Atlanta plant as a machine operator through www.indeed.com, a job posting website. (*Id*. ¶ 15.) On May 20, 2015, Plaintiff received an email from Maria E. Tourn, a World Emblem employee, to remind him that he had an interview scheduled for that day at 2:00 pm. (*Id*. ¶ 17.) Plaintiff attended the May 20th interview as scheduled. (*Id*.) Plaintiff filled out documentation, but was not provided with a stand-alone disclosure and authorization allowing the background check. (*Id*. ¶ 18.)

Shortly thereafter, Plaintiff was conditionally hired pending a background check and drug screening. (*Id*. ¶ 19.) Plaintiff took and passed the drug test on May

---

[3] *See, e.g.*, FTC Advisory Opinion to Weisberg, available at URL http://www.ftc.gov/policy/advisory-opinions/advisory-opinionweisberg- 06-27-97.)

21, 2015 and subsequently completed his training. (*Id*. ¶¶ 20, 21.) He started work with World Emblem on May 26, 2015. (*Id*. ¶ 21.)

At the end of the training period, however, World Emblem procured a consumer report about Mr. Woodford. (*Id*. ¶ 22.) The report was completed on June 2, 2015 at 1:42 pm. (*Id*.) On June 4, 2015 Plaintiff was called into an office with his supervisor and was informed by Iris Canton, a World Emblem HR employee, that he was fired because of the information contained in his background check. (*Id*. ¶ 23.) Woodford was not provided with a copy of the background check or a summary of his FCRA rights before being informed that he was terminated. (*Id*. ¶ 25.) Rather, towards the end of the meeting with Ms. Canton Plaintiff was handed a piece of paper with information about how he could contact the background check company to receive a copy of the background check. (*Id*. ¶ 24.)

Woodford thereafter contacted the background check company, Asurint, and requested the report. (*Id*. ¶ 26.) Asurint printed the background check report on June 9, 2015 and sent it to Plaintiff via U.S. mail. (*Id*.) On June 18, 2015, Plaintiff received a document from World Emblem dated June 16, 2015 notifying him of the adverse action and directing him to Asurint's website to view or obtain a copy of the background check report. (*Id*. ¶ 27.)

The June 16, 2015 letter states that, "[t]he decision was based in whole or in

part on information contained in a report from, a copy of which was previously given to you." (*Id*. ¶ 28.) This is inaccurate. Again, Plaintiff was fired on June 4, 2015 and was not given the report prior to that time. (*Id*.) Plaintiff received the report for the first time after requesting it from Asurint, which printed the report on June 9, 2015. (*Id*.) On or around June 26, 2015, Plaintiff received a "Separation Notice" in the mail, which was dated June 23, 2015. (Id. ¶ 29.) The Separation Notice listed Plaintiff's last day of employment as June 4, 2015 and stated that the reason for separation was "Involuntary: Due to the nature of the offenses generated in the back ground (sic) check World Emblem did not continue David's employment." (*Id*.) Woodford also knew of two other co-workers who were fired by World Emblem at the same time for background check issues, and those individuals were not provided the FCRA-required documents either. (*Id*. ¶ 30.)

Because the FCRA requirements allegedly violated by World Emblem have been in place for over a decade with substantial guidance from both Courts and the FTC, Plaintiff filed the instant lawsuit seeking redress for himself and all others similarly situated. World Emblem denies that it violated the FCRA and denies that it is liable to Woodford and the class members.

## C.   Procedural History

On August 25, 2015, Plaintiff Woodford filed his Class Action Complaint against World Emblem for both violations of the Act. (Dkt. 1.) Along with the

Complaint, Woodford also served a Motion for Class Certification or for a Deferred Ruling Pending Discovery. (Dkt. 3.) Following the filing of the Complaint, World Emblem appeared in the case (Dkt. 8) and reached out to Plaintiff's counsel to discuss the litigation. (Dkt 22-2, Woodrow Decl., ¶ 8.) During this and other early communications, counsel for the Parties exchanged preliminary information regarding the size and scope of the putative classes as well as information regarding potential settlement frameworks. (*Id*. ¶ 9.) Based on these early talks the Parties agreed to seriously explore the potential for settling the case.

To provide sufficient time for allowing their negotiations to develop, on December 8, 2015 the Parties filed a Joint Motion to Stay the litigation pending the outcome of settlement discussions. On January 11, 2016 the Court granted the stay and at the same time administratively closed the case pending the outcome of the negotiations.

During the weeks that followed, counsel for the Parties engaged in discussions firming up the size of the classes and engaged in a robust exchange of essential information before mediation. Ultimately the Parties agreed to mediate the case in Denver, Colorado through Conflict Resolution Services ("CRS").

On September 12, 2016 Plaintiff filed a Joint Motion to reopen the case together with a Motion for Preliminary Approval. On October 19, 2016 the Court entered its Order granting preliminary approval. (Dkt. 21.)

**D.     Settlement is achieved through the mediation process.**

Counsel for the Parties, together with counsel for World Emblem's insurer, convened for a mediation session with Joe Epstein of CRS in Denver, Colorado, a well-respected neutral. (Dkt. 22-2, Woodrow Decl., ¶ 11.) The negotiations included face-to-face discussions as well as separate caucuses. (*Id*. ¶ 12.) Ultimately, and with Mr. Epstein's assistance and oversight, the Parties were able to reach an agreement in principle with respect to the settlement framework and certain key terms, including the dollar value of each claim and World Emblem's responsibility for the class notice. (*Id*. ¶ 12.) Only once such terms were agreed to the Parties negotiated an incentive award for Woodford and reasonable attorneys' fees for proposed Class Counsel. (*Id*. ¶ 13.)

Following the mediation, the Parties negotiated and drafted a "Memorandum of Agreement," and thereafter drafted more complete and formal settlement documents. (*Id*. ¶ 14.) The Settlement Agreement was executed in August 2016. (*Id*. ¶ 15.) The key terms of the Settlement Agreement are set forth below. As part of the settlement, World Emblem agrees to class certification for settlement purposes only and does not by doing so waive any arguments it may have that certification under Rule 23 is improper.

**III.   Key Terms of the Settlement**

The precise terms of the settlement are contained in the Settlement

Agreement. (Dkt. 22-1.) The essential terms include:

   A.   **Class Definition.** The "Settlement Class" or "Class" is defined as all Persons in the United States or its territories who from August 23, 2013 to the date notice is sent to the Class had a consumer report obtained about them by World Emblem in regard to the Person's actual or potential employment with World Emblem. (Dkt. 22-1, Settlement Agreement § 1.7.)

   B.   **Monetary Relief**

   Defendant has agreed to provide to each Class Member who files a timely and executed claim form a cash payment either in the amount of $315 or a $400 worth of storage services. (Settlement Agreement § 2(a).) Cash payments of $315 are available for claimants who were provided with an allegedly deficient notice while World Emblem has agreed to pay $400 to claimants who had allegedly an adverse action taken against them. (Dkt. 22-1, Settlement Agreement § 2(a).)

   C.   **Prospective Relief**

   As an additional benefit, World Emblem has agreed to fix the alleged problems that served as the basis for the litigation in the first place. That is, since January 2016, World Emblem has used a "standalone" notice that has been reviewed by Class Counsel and to otherwise comply with the FCRA.

   D.   **Release of Liability**

   In exchange for the relief described above, World Emblem will receive a full

release of any claims relating to the FCRA belonging to any Settlement Class

Members and a full release of all claims for Plaintiff Woodford. (Settlement

Agreement § 3.)

As explained below, such terms are decidedly favorable to the Class and the

Court should grant preliminary approval to the instant Agreement.

## IV.   THE SETTLEMENT SHOULD RECEIVE FINAL APPROVAL

There is a strong judicial and public policy favoring the voluntary

conciliation and settlement of complex class action litigation. *In re U.S. Oil & Gas*

*Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the

pretrial settlement of class action lawsuits"); *Warren v. City of Tampa*, 693 F.

Supp. 1051, 154 (M.D. Fla. 1998), *aff'd*, 893 F. 2d 347 (11th Cir. 1998); *Access*

*Now, Inc v. Claires Stores, Inc.*, 2002 WL 1162422 at *4 (S.D. Fla. May 7, 2002).

With a settlement, the class members are ensured a benefit as opposed to the "mere

possibility of recovery at some indefinite time in the future." *In re Domestic Air*

*Transport*, 148 F.R.D. 297, 306 (N.D. Ga. 1993). While the Court has discretion

regarding the approval of a proposed settlement, it should give proper deference to

the private consensual decision of the parties. *Warren*, 693 F. Supp. at 1054

("affording great weight to the recommendations of counsel for both parties, given

their considerable experience in this type of litigation").

Ultimately, the Court should approve a class action settlement if it is fair,

adequate, and reasonable and not the product of collusion. *Bennett v. Behring*, 737 F. Supp. 982, 986 (11th Cir.1984); *Access Now*, 2002 WL 1162422 at \*4. When conducting this analysis, the Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001).

In approving a class action settlement, a district court must conduct "a hearing and ... [find] that it is fair, reasonable, and adequate." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The district court must also find that the settlement is not the product of collusion between the parties." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 (11th Cir. 2012).[4] The procedure for review of a proposed class action settlement is a well-known two-step process. Alba & Conte, 4 Newberg on Class Actions, §11.25, at 38-39 (4th Ed. 2002); *see also* David F. Herr, Annotated Manual for Complex Litigation, § 21.632 (4th ed. 2004). The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." Newberg, §11.25, at 38-39 (quoting Manual for Complex Litigation, §30.41 (3rd Ed.)); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1110 (9th Cir. 2008). This first step, preliminary approval, was satisfied on October 19, 2016 when the Court entered its preliminary

---

[4] "Determining the fairness of the settlement is left to the sound discretion of the trial court," and will not be overturned absent an abuse of such discretion. *Bennett*, 737 F.2d at 986.

settlement approval and ordered that notice be disseminated (Dkt. 21.)

The second step, final approval, follows notice to the Class and the receipt of Class Member responses. On or about November 18, 2016, the Settlement Administrator began sending notice to the identifiable Settlement Class Members and the response has been overwhelming. (*See* Declaration of Stephen Donaldson, attached hereto as Ex. A, ¶ 4.) Ninety-two (92) claims have been submitted (*id.* ¶ 8) and several Class Members have called Class Counsel's offices to discuss the case and the Settlement. Moreover, there have been no objections to the Settlement at all. As will be explained, this is a terrific result.

In general, determining whether to grant final approval requires that the Court review and consider the following six factors: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F. Supp. at 986; *see also In re Sunbeam*, 176 F. Supp. 2d at 1329. The court is not required, however, to "reach any ultimate conclusions on the issues of fact and law underlying the dispute." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

As explained below, each consideration favors approval of the Settlement

Agreement.

**A.      The Likelihood of Success at Trial.**

Plaintiff is confident that he would have prevailed at trial. Having said this, there are always risks with litigating, and even multi-million dollar judgments have been reversed on appeal following trial. The uncertainty here was most evident given World Emblem's numerous defenses. This includes defenses based on the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892, 191 L. Ed. 2d 762 (2015). That case calls into question whether class members have suffered any concrete harm. *Compare Perrill v. Equifax Info. Servs., LLC*, No. A-14-CA-612-SS, 2016 WL 4572212, at *4 (W.D. Tex. Aug. 31, 2016) ("Considering this history and Congress's judgment, the Court finds an invasion of privacy within the context of the FCRA constitutes a concrete harm that meets the injury-in-fact requirements. The Court is not alone in this holding.") *with Larroque v. First Advantage LNS Screening Sols., Inc.*, No. 15-CV-04684-JSC, 2016 WL 4577257, at *5 (N.D. Cal. Sept. 2, 2016) (Corley, M.J.) ("Accordingly, the Court agrees with Defendant and concludes that Plaintiff has alleged nothing more than a bare procedural violation of the FCRA—having provided express written consent to have her consumer report pulled, reviewed, and considered for purposes of employment, Plaintiff has not suffered an 'invasion of privacy' or any other concrete harm.")

As such, while Plaintiff is nearly certain that he could have prevailed on both certification and on the substantive merits of the case, he must allow room for reasonable doubt as to the recovery.

### B.    The Range of Possible Recovery.

Given the number of Settlement Class Members (488 total), a judgment under the FCRA, which allows for $100 - $1,000 in statutory damages, would have fallen within a range of $48,800 - $488,000. The instant Settlement Agreement requires World Emblem to pay $315 to claimants who received a faulty notice ($153,720 if all 488 Settlement Class Members were to file claims) and $85 additional dollars, or $400 total, to the 17 persons who experienced an adverse action ($6,800). When the costs of notice ($20,000 to $25,000) and attorneys fees ($90,000) and the Class Representative incentive award are included ($2,000), the Settlement Agreement secures benefits to the Settlement Class worth approximately $272,520. This amount represents 55.84% of the maximum possible statutory damages award and reflects an amount over 5.5 times larger than the minimum award. These are results are undeniably impressive when the risks attendant to *Spokeo* are priced in.

As such, the amount recovered is substantial when considering the possible range of recovery.

### C.    The Point on or Below the Range of Possible Recovery at Which Settlement is Fair, Adequate and Reasonable.

The Settlement Fund represents an amount that falls well within the potential range of recovery. Accordingly, this factor suggests that the amount secured is fair reasonable and adequate. The dollar amounts secured—$315 and $400—are at the higher-end of the range for comparable FCRA settlements, several of which feature per claim amounts below $100.[5] *See Reardon v. ClosetMaid*, 2:08–cv–01730 (W.D. P.A.) (approving settlement agreement that featured direct payments to 1,400 class members in the amount of $400 each ($632,000 to the class plus $950,000 in attorneys' fees); *Singleton v. Domino's Pizza*, LLC, DKC 11–1823 (D. Md.) ($260 per claim, $2.5 million fund, $625,000 in attorneys' fees); *Johnson v. Midwest Logistics Sys.*, Ltd., No. 2:11-CV-1061, 2013 WL 2295880 (S.D. Ohio May 24, 2013) ($260 per notice claimant, $1,000 per adverse action claimant, $149,285 in reasonable attorneys' fees).

As such, the per claim amount recovered here beats the claim values in some of the most prominent FCRA background check class action settlements.

### D.    The complexity, expense and duration of the litigation favors settlement.

The case, while straightforward for a class action, was undoubtedly complex. Proposed Class Counsel has expended meaningful hours litigating and

---

[5] *See, e.g.*, *Knight v. Publix*, Case No. 3:14-cv-1720 (M.D. Tenn.) (approving FCRA disclosure class action settlement for $75 per claim).

negotiating a favorable resolution of the case. This was made possible because, shortly following defendant's appearance in the case, the Parties began discussing resolution, which included the exchange of critical informal discovery directly related to the claims. In short, the discovery facilitated in connection with the settlement discussions and mediation process allowed proposed Class Counsel to make a fair evaluation of the Settlement terms. (*Id*. ¶ 35.) And again, the jurisdictional standing question posed by *Spokeo* added a layer of complexity.

As such, the complexity, expense, and duration of the litigation favors approving the Settlement Agreement as well.

### E.   The Substance and Amount of "Opposition" to the Settlement Favors Approval of the Settlement Agreement.

As indicated above, 92 claim forms have been filed, and no one has objected or opted out at all. (Donaldson Decl. ¶ 7.) The absence of any objections speaks to the strength of the Settlement. *See Bell Atl. Corp.* v. *Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected. . . . This small proportion of objectors does not favor derailing settlement."); *accord*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (fact that only two class members objected out of 300,000 weighed in favor of requested fee award). Likewise, no one chose to opt out either. (Donaldson Decl. ¶ 6.)

This factor therefore weighs heavily in favor of granting final approval.

### F.   The Stage of Proceedings Favors Approval as Well.

As also explained above, the Settlement Agreement was reached only following substantial arm's-length negotiations that included a full-day mediation session with Mr. Epstein. Through the discussions and informal discovery process, proposed Class Counsel were able to obtain critical information regarding the size and scope of the proposed Settlement Class, the nature of World Emblem's alleged liability, and the outline for a potential class action settlement. Accordingly, the stage of the proceedings is such that proposed Class Counsel came to the negotiations armed with the ability to fairly judge the reasonableness and adequacy of the proposed recovery.

As a final consideration here, and while not dispositive, it bears restating that the Settlement Agreement was negotiated by a well-respected mediator with substantial experience in resolving large complex matters. (Dkt. 22-2, Woodrow Decl., ¶ 10.) The mediator assured that at all times the negotiations were professional and arm's-length.

Accordingly, that the Settlement was negotiated with sufficient information suggests that the Settlement was reached at a sufficiently advanced stage of the proceedings so as to favor approval.

## V.     THE NOTICE PLAN SATISFIED DUE PROCESS

Pursuant to the Settlement Agreement, the Parties together with national claims administrator Settlement Services Inc., developed a notice plan to inform

the class of this settlement in several ways. (Settlement Agreement § 1.44.) First, a
"short form" notice was mailed, on or around November 18, 2016, directly to 488
Settlement Class Members informing them of the Settlement. (Donaldson Decl. ¶
4.) Ninety (90) notices were returned as undeliverable and those addresses were
run through a skip trace to locate an accurate address. (*Id.* ¶ 5.) Of these 90
bounce-backs, 76 notices were re-mailed. (*Id.*) This direct mailing therefore
reached nearly 97% of the Settlement Class ((397 + 76)/488 = .969).

Class Counsel also fielded telephone inquiries and obtained the Settlement
Class List with telephone numbers so as to allow for open communications with
Settlement Class Members. As a result, the Settlement features a rather robust
claims rate of 18.85%.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant
final approval to the Class Action Settlement reached in this case and Order that
Final Judgment be entered in favor of the Settlement on the terms set forth in the
Settlement Agreement and for such additional relief as the Court deems necessary
and just.

Dated: January 4, 2017                    **DAVID WOODFORD**, individually and on
                                          behalf of all others similarly situated,

                                          By:   /s/ Patrick H. Peluso

Steven L. Woodrow*
swoodrow@woodrowpeluso.com
Patrick H. Peluso*
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 E Mexico Ave., Suite 300
Denver, Colorado 80210
Tel: 720.213.0675
Fax: 303.927.0809

Jennifer Auer Jordan (No. 027857)
jordan@ssjwlaw.com
Shamp Speed Jordan Woodward
1718 Peachtree St., N.W., Suite 660
Atlanta, GA 30309
Tel: 404.893.9400
Fax: 404.260.4180

*Pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 4, 2017, I served the above and foregoing papers by causing such paper to be filed with the Court using the Court's electronic filing system, which will send copies of such paper to all counsel of record.

<u>/s/ Patrick H. Peluso</u>

## <u>LOCAL RULE 5.1 CERTIFICATION</u>

I hereby certify that on January 4, 2017, I filed the above and foregoing papers

with the Clerk of the Court and that such papers comply with Local Rule 5.1 and

were prepared using a typeface of 14 points in Times New Roman.

<u>/s/ Patrick H. Peluso</u>